JEWISH HOSPITAL ASSOCIATION OF LOUISVILLE, KENTUCKY, INC., Plaintiff–appellant, Cross–appellee,

v.

STEWART MECHANICAL ENTERPRISES, INC., and James E. Smith & Sons, Inc., Defendants–appellees, Cross–appellants.

No. 78-3373-74.

United States Court of Appeals, Sixth Circuit.

Argued June 19, 1980.

Decided Aug. 29, 1980.

Rehearing Denied Sept. 29, 1980.

Irwin G. Waterman, Morris, Garlove, Waterman & Johnson, Alan N. Linker, Louisville, Ky., for plaintiff–appellant, cross–appellee.

Donald H. Balleisen, Greenebaum, Doll & McDonald, John S. Reed, II, Louisville, Ky., for James E. Smith.

Frank E. Haddad, Jr., Louisville, Ky., for Stewart Mec.

Before KENNEDY and JONES, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Harry PHILLIPS, Senior Circuit Judge.

Plaintiff Jewish Hospital Association of Louisville, Kentucky, Inc. (the Hospital) filed this treble damage antitrust action under §§ 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, alleging the defendants, Stewart Mechanical Enterprises, Inc. (Stewart) and James E. Smith & Sons, Inc. (Smith), conspired to fix the price of mechanical (plumbing, heating, air–conditioning and sheet metal) work on the 1970 Wheeler Addition to the Jewish Hospital. Chief District Judge Charles M. Allen granted summary judgment for the defendants on the ground the suit is barred by the indirect–purchaser doctrine of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The Hospital appeals. Stewart and Smith have cross–appealed from Judge Allen's refusal to hold the suit barred by the Clayton Act's four year statute of limitations, 15 U.S.C. § 15b. Because we hold the *Illinios Brick* rule bars the suit, we affirm without reaching the statute of limitations question.

I

In 1970, the Hospital solicited bids from general contractors for the construction of the Wheeler Addition. As required by the bidding procedure, interested general contractors submitted lists of subcontractors from whom they proposed to solicit bids. Joseph & Joseph, the architects, approved nine mechanical subcontractors they considered reputable, including Stewart and Smith, the defendants in this suit.

Five general contractors submitted bids on the project. The low bidder was Wilhelm Construction Company of Indianapolis, Indiana (Wilhelm or the general contractor). Wilhelm's bid of $11,487,844 exceeded the architects' pre–bid estimate by more than $2.3 million, or about 30 percent. Some $3 million of the total bid represented Stewart's low bid on the mechanical subcontract work, a figure about 25 percent above the pre–bid estimate.

In June 1970, Wilhelm was awarded the general contract, subcontracted with Stewart, and began construction of the Wheeler Addition. Construction was completed and the final progress payment was made in August 1974.

In May 1972, Smith and various other mechanical contractors were indicted for price–fixing in the Louisville area. Stewart was named an unindicted co–conspirator. At the same time, the Government filed a civil action against the criminal defendants. Defendants pleaded *nolo contendere*, in the criminal action and entered into a consent decree in the civil action. Smith was sentenced in the criminal case on February 16, 1973 and final judgment was entered in the civil case on September 13, 1973.

On November 18, 1975 the Government filed concurrent civil and criminal price–fixing actions against Stewart, which had been been named a co–conspirator but not a defendant in the Government's prior actions against Smith. Two days later, the Government filed similar price–fixing actions against various general contractors, including several that had bid on the Hospital addition. On March 8, 1976 the Government filed bills of particulars in both criminal actions alleging, inter alia, the defendants had engaged in bid–rigging in connection with the Jewish Hospital project. Stewart pleaded *nolo contendere*, on August 31, 1977.

Based on the information contained in the Government's complaints and bills of particulars, the Hospital filed two treble damage actions in September 1976 under §§ 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22. In *Jewish Hospital Association of Louisville, Kentucky, Inc. v. Struck*, 77 F.R.D. 59 (W.D.Ky. 1978), the Hospital alleged a horizontal conspiracy among vari-

ous named and unnamed general contractors, including Wilhelm, the successful bidder, to fix prices for the general contracting work on the Wheeler Addition. In the second of the two actions, the case at bar, the Hospital alleged a separate horizontal conspiracy between Stewart and Smith to fix the price of the mechanical subcontracting work on the Addition.

Stewart and Smith answered, denying liability and claiming the suit is barred by the Clayton Act's four–year statute of limitations, 15 U.S.C. § 15b. Subsequently, on July 6, 1977, the defendants moved for summary judgment on the additional ground the suit is barred by the indirect–purchaser doctrine of *Illinois Brick Co. v. Illinois, supra.*

The Hospital responded by arguing the statute of limitations does not bar the action because the defendants fraudulently had concealed their price–fixing. Furthermore, the Hospital argued, the case falls within an exception to the *Illinois Brick* rule. Finally, the Hospital moved to consolidate the action against the general contractors with the case at bar on the ground the general contractors who knew or should have known there was insufficient competition among the mechanical subcontractors became parties to the subcontractors' antitrust violation. The defendants in both cases opposed this motion, and the district court refused to consolidate.

After deferring any ruling on the *Illinois Brick* motion until it became clear that then pending legislation[1] to overrule that case would not become law, the court granted summary judgment for the defendants. The court found the Hospital had contracted for the construction of the Wheeler Addition with Wilhelm which, in turn, had bought all mechanical work from Stewart. This two tier relationship makes the case analogous to *Illinois Brick*, the district court held, and the indirect–purchaser doctrine therefore bars the suit. The court also discussed the statute of limitations issue, but

denied summary judgment on the ground that the undisputed facts do not show the suit is time–barred.

The Hospital appeals from the summary judgment for the defendants on the *Illinois Brick* ground. The defendants cross–appeal from the court's refusal to grant summary judgment on the statute of limitations ground.

## II

In *Illinois Brick*, the State of Illinois and some 700 local governmental entities sued concrete block manufacturers for price–fixing. The plaintiffs argued masonry contractors had paid the artificially inflated price, incorporated the blocks into subcontracted masonry work on public buildings, and passed on the overcharge to general contractors who, in turn, had passed it on to the plaintiffs. Relying on the Supreme Court's earlier rejection of the passing–on defense in *Hanover Shoe Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the district court held the plaintiffs could not use a passing–on theory affirmatively to establish damages, and granted partial summary judgment for the defendants. The Seventh Circuit reversed, holding the plaintiffs could recover if they could prove the illegal overcharge had been passed on to them by the direct and intermediate purchasers. The Supreme Court reversed the Seventh Circuit's decision, holding that only the direct purchasers, the masonry contractors, could sue for treble damages under § 4 of the Clayton Act.

The Court articulated two basic reasons for extending the *Hanover Shoe* ban on defensive use of passing–on to cases where indirect purchasers seek to use the pass–on argument offensively to establish damages. First, the Court decided it is more efficient to limit damage recoveries under the Clayton Act to direct purchasers of the price–fixed product than to spread that recovery among all the purchasers in the chain of

1. *See* S. 1874, 95th Cong., 2d Sess. (June 14, 1978); H.R. 11942, 95th Cong., 2d Sess. (August 11, 1978).

distribution. Under *Hanover Shoe* the brick manufacturers could not assert a passing–on defense against the masonry contractors. Allowing indirect purchaser–plaintiffs to argue that the illegal overcharge had been passed through to them would subject the defendants to the risk of multiple liability. Only by joining all potential plaintiffs as parties to the suit could the multiple liability problem be eliminated However, joining all potential plaintiffs would prove difficult or impossible in many cases, particularly where the price–fixed product had been incorporated into consumer goods. Moreover, joining all direct and indirect purchasers in a single suit would transform antitrust actions into massive damage apportionment proceedings whose complexity would increase the overall cost of litigation, diffuse the benefits of bringing a treble damage action, and thereby reduce the incentive to sue. 431 U.S. at 745, 97 S.Ct. at 2074. Given the longstanding policy of encouraging vigorous private enforcement of the antitrust laws, the Court opted for concentrating the full treble damage recovery at the direct purchaser level.

Second, and more important, determining how much of the overcharge actually had been passed through at each level would be nearly impossible. Even under the simplifying assumptions of economic theory, calculating the amount of the pass–through at any level would involve resolving conflicting expert opinions as to the elasticity of demand for the particular product. Furthermore, because pricing decisions in the real world of imperfectly competitive markets often do not fit an economist's model, theoretical calculations of the amount passed through would only approximate reality. Compounded by the need to repeat the calculations at each level in the chain of distribution, the difficulties and uncertainties of proof would make treble damage actions too complex to be either manageable or effective enforcement mechanisms. Accordingly, the Court held only direct purchasers of price–fixed products may recover in treble damage actions under the Clayton Act.

On its face, *Illinois Brick* seems to bar the Hospital's suit. The price allegedly fixed was the price of the mechanical subcontracting work. The direct purchaser of that work was the general contractor, not the Hospital. Only after the general contractor had incorporated the mechanical work into the finished Wheeler Addition was it resold to the Hospital. To prevail against the defendants, the Hospital would have to prove what portion of the illegal overcharge the general contractor passed on in the form of a higher price for the completed building. *Illinois Brick* seems to prohibit such proof.

The Hospital argues, however, that its suit falls within several exceptions to the *Illinois Brick* rule. First, the Hospital says, the direct purchaser (Wilhelm) was controlled, either by the indirect purchaser (the Hospital) or by the seller (the defendants), so that market forces were superseded and the buyer–seller relationship between the defendants and Hospital effectively was direct. *See Illinois Brick Co. v. Illinois, supra,* 431 U.S. at 736 n.16, 97 S.Ct. at 2069. Second, since the general contractor purportedly added a fixed percentage markup to the subcontractors' bids, the Hospital argues that its relationship with the general contractor was the functional equivalent of a pre–existing cost–plus contract, another exception to the passing on rule. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp., supra,* 392 U.S. at 494, 88 S.Ct. at 2232. Finally, the Hospital urges there was a vertical conspiracy involving both the defendants and the general contractors, a situation some courts have found outside the rationale of the indirect–purchaser rule. *See, e. g., Florida Power Corp. v. Granlund,* 78 F.R.D. 441 (M.D.Fla.1978). In our view, none of these exceptions applies to this case.

### A

■ The Hospital's first argument takes two alternative forms. As one possibility, the Hospital argues the general contractor was controlled by the defendants. Accord-

ing to the Hospital, it was irrelevant to the defendant mechanical contractors which general contractor was awarded the Wheeler Addition contract. Stewart and Smith were the only mechanical contractors who bid, and they allegedly conspired to fix their prices. The various general contractors thus were mere conduits for the illegal overcharge, and this fact supposedly brings the case within the rationale of the "control" exception. Alternatively, the plaintiff argues the general contractor was controlled by the Hospital, which found it useful to purchase subcontracting services through an agent rather than directly. According to this argument, the general contractor's task was not to deliver a completed building but to assemble a package of goods and services for the Hospital.

Neither of these theories brings the present case within the rationale of the "control" exception. As examples of situations where an ownership or control relationship between an indirect purchaser and a direct purchaser might make the passing-on bar inapplicable, the *Illinois Brick* Court cited *Perkins v. Standard Oil Co.*, 395 U.S. 642, 648, 89 S.Ct. 1871, 1874, 23 L.Ed.2d 599 (1969) and *In re Western Liquid Asphalt Cases*, 487 F.2d 191, 199 (9th Cir.1973), *cert. denied*, 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974). In *Perkins*, the Court held the defendant could not avoid liability under the Robinson–Patman Act for price discrimination merely by channelling the illegal discount through its 60 percent-owned subsidiary. In *Western Liquid Asphalt* there was evidence that the defendants controlled their direct customers either by acquiring their stock or by arranging to finance their purchases. Mindful of the *Illinois Brick* Court's emphasis upon the narrow scope of exemptions to the indirect-purchaser rule, 431 U.S. at 745, 97 S.Ct. at 2074, we read these citations as evidence that the "control" exception is limited to relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale. *See In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1162 (5th Cir.1979).

In the present case, the Hospital has alleged no such functional unity. Even if the defendants submitted rigged bids to all the general contractors and were indifferent which one was awarded the contract, this fact does nothing to convert the two-step transaction into the equivalent of a single sale. Compare *In re Sugar Industry Antitrust Litigation*, 579 F.2d 13, 18 (3d Cir. 1978) in which the court found no *Illinois Brick* problem where manufacturers allegedly fixed the price of sugar which their subsidiaries incorporated into candy purchased by the plaintiffs. *See also Obron v. Union Camp Corporation*, 477 F.2d 542 (6th Cir.1973), a case in which this court permitted the defendant to assert a passing-on defense against the plaintiff who had sold the defendant's allegedly price-fixed product under what amounted to a commission arrangement. Nor does it help the Hospital to argue the general contractor merely procured services rather than constructed the building. Wilhelm's "package of services" was one of five such "packages" offered to the Hospital. Wilhelm was selected because the overall price of its "package" was lowest. This is a far cry from situations where a purchaser employs an independent broker or purchasing agent to procure a particular good or service. *E.g., In re Toilet Seat Antitrust Litigation*, 1977–2 Trade Cas. ¶ 61,601 (E.D.Mich.1977). Neither of the Hospital's theories suggests market forces were superseded. Problems of proving the amount of the pass-on remain undiminished. Accordingly, the "control" exception to the *Illinois Brick* rule does not save this action.

B

The Hospital's second argument is that its relationship with the general contractor was the functional equivalent of a pre-existing cost–plus contract which allowed the general contractor to pass on the full amount of the illegal overcharge without any loss of sales volume. Specifically, the Hospital says, the general contractor merely solicited bids from subcontractors, added

a fixed percentage markup to each, and submitted the total figure as its bid on the Wheeler Addition. Since the general contractor did not have to enter into contracts with the subcontractors until it was awarded the Wheeler Addition contract, the general contractor had nothing to lose by including the entire amount of the overcharge in its bid. By accepting the bid, the Hospital committed itself to buy the entire package, which included the full amount of the illegal overcharge. Accordingly, the Hospital says, the arrangement was the equivalent of a cost–plus contract.

■ Pre–existing cost–plus contracts are outside the rationale of the passing–on bar. As the Supreme Court recognized in *Illinois Brick*:

> In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.

431 U.S. at 736, 97 S.Ct. at 2069–70. In other words, because passing on the entire amount of the overcharge cannot decrease its sales, the direct purchaser has no incentive to absorb any of the overcharge itself. This being so, the problem of tracing the overcharge to the indirect purchaser is eliminated.

■ The Hospital's relationship with the general contractor, however, lacks the essential characteristic of pre–existence that removes the contractor's incentive to absorb part or all of the overcharge. Wilhelm presumably hoped to secure the general contract on the Wheeler Addition. To do so, it had to submit the lowest bid. Given the need to submit the lowest bid, Wilhelm may have responded to the defendants' unexpectedly high bids on the mechanical work by reducing its profit margin or by taking steps to cut its overall costs. The courts have no way of ascertaining precisely how the general contractor reacted to the defendants' alleged price–fixing. This is exactly the type of uncertainty that caused the Supreme Court to reject a similar passing–on argument in *Illinois Brick*:

> An exception for the contractors here on the ground that they purport to charge a fixed percentage above their costs would substantially erode the *Hanover Shoe* rule without justification. Firms in many sectors of the economy rely to an extent on cost–based rules of thumb in setting prices. See F. Scherer, Industrial Market Structure and Economic Performance 173–179 (1970). These rules are not adhered to rigidly, however; the extent of the markup (or the allocation of costs) is varied to reflect demand conditions. *Id.*, at 176–177. The intricacies of tracing the effect of an overcharge on the purchaser's prices, costs, sales, and profits thus are not spared the litigants.

431 U.S. at 744, 97 S.Ct. at 2074. Similarly, we find no basis in this case for treating the relationship between the Hospital and the general contractor as an exception to the rule of *Illinois Brick.*

*In re Beef Industry Antitrust Litigation, supra,* 600 F.2d at 1164–66, on which the Hospital relies heavily, is not to the contrary. In that case, cattle producers sued supermarket chains for artificially depressing wholesale beef prices by agreeing not to pay more than a fixed price. Because the chains have extensive cold storage facilities and processors do not, the chains could withstand processors' attempts to withhold beef in order to drive up the wholesale price. The processors' only recourse was to pass on the undercharge by reducing the price they would pay for beef cattle. The plaintiff cattle producers, in turn, were forced to sell at the artificially depressed slaughterhouse price because fattened cattle become less valuable if they are not sold within three weeks of the time they reach choice grade. 600 F.2d at 1154. Thus, under the allegations of the complaint, the producers' need to sell their cattle effectively insulated the middlemen processors from any reduction in their ability to purchase beef cattle, even at artificially low prices.

Therefore, the middlemen had no incentive to absorb any of the wholesale undercharge themselves. Because these highly inelastic short–term supply conditions made it simple to calculate the amount of the pass–through, the Fifth Circuit found the rationale of *Illinois Brick* inapplicable and held the plaintiffs had alleged the functional equivalent of a pre–existing cost–plus contract. 600 F.2d at 1164–65.

The present case, however, includes most of the uncertainties and problems of proof that troubled the Court in *Illinois Brick*. The Hospital's demand for Wilhelm's services was limited by the competing bids: only by underselling its four competitors could Wilhelm secure the contract. Since the general contractor presumably did not know what its competitors would bid, it had an incentive to absorb part or all of the overcharge. This being so, we do not consider the relationship between Wilhelm and the Hospital the functional equivalent of a pre–existing contract. The *Beef Industry* case is distinguishable. *See Eastern Airlines, Inc. v. Atlantic Richfield Company*, 609 F.2d 497, 498 (Tem.Emer.Ct.App.1979). *Compare Obron v. Union Camp Corporation, supra*, 477 F.2d 542 (6th Cir.1973) (which allowed a passing–on defense where the middleman had sold for the defendant under what amounted to a commission arrangement) *with Phillips v. Crown Central Petroleum Corp.*, 602 F.2d 616, 633 (4th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1021, 62 L.Ed.2d 756 (1980) (finding no cost–plus equivalent where gasoline retailers were forced to vary their prices in relation to fixed wholesale prices).

### C

■ Finally, the Hospital argues there could have been a vertical conspiracy between the various general contractors and the defendants to fix the price of the mechanical work on the Wheeler Addition. Smith and Stewart were the only mechanical subcontractors to bid on the Addition. Their bids allegedly were rigged. The Hospital argues that any general contractor who knew or should have known the bids were rigged and who incorporated the rigged bids into its own bid calculations became a party to the conspiracy. Under the Hospital's theory, such a general contractor would be jointly and severally liable for the full amount of the overcharge, and the Hospital would not have to assert a pass–on theory to prove its damages.

The problem with this argument is that the Hospital has never pleaded the existence of a vertical conspiracy nor alleged facts sufficient to sustain such an allegation. Instead, the Hospital's complaints alleged two separate horizontal conspiracies, one among the general contractors and the other between Stewart and Smith. Only when the defendants moved for summary judgment under *Illinois Brick* did the Hospital move to consolidate the actions. The motion stated only that some of the general contractors computed their final bids by adding a percentage to the subcontractors' bids and that any general contractor who did so knowing the mechanical subcontract bids were rigged became a party to the illegality. The Hospital has never alleged that any of the general contractors knew the subcontractors' bids were rigged nor indicated what facts would have put the general contractors on notice of the defendants' illegal activities. In the absence of such allegations, the Hospital's vertical conspiracy argument impresses the court as a transparent attempt to evade the rule of *Illinois Brick*. *Cf. In re Beef Industry Antitrust Litigation, supra*, 600 F.2d at 1161–63 (rejecting a similar belated attempt to argue the existence of a vertical conspiracy). Under the circumstances, we need not decide whether proof of knowledge and passing on, without actual agreement, would establish a vertical conspiracy nor whether such conspiracies are outside the rationale of *Illinois Brick*. *See Id.*

We have considered the Hospital's remaining arguments and conclude that they are without merit. Because *Illinois Brick* controls the result in this case, we do not reach the merits of the statute of limitations issue.

The judgment of the district court is affirmed.