**STATE OF ILLINOIS, et al., Plaintiffs,**

v.

**BORG, INC., et al., Defendants.**

**Nos. 79 C 5253, 79 C 3046 and 79 C 3077.**

United States District Court, N.D. Illinois, E.D.

Sept. 10, 1982.

Thomas M. Genovese, Bruce J. Baker, Asst. Attys. Gen., State of Ill., Chicago, Ill., for plaintiff District No. 202.

Robert J. Bates, Phelan, Pope & John, Ltd., Chicago, Ill., for plaintiff Mutual Trust Life Ins. Co.

John E. Burke, Fred W. Mattlin, Claudia J. Lovelette, Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

As indicated in prior opinions in these class actions, plaintiff property owners charge 22 piping construction companies and 36 individuals with bid-rigging, price-fixing and job allocation in the Chicago area from 1956 to 1977. However the current motion deals with only four individual transactions, three involving the Board of Education of Evanston Township High School District No. 202 ("District") and one involving Mutual Trust Life Insurance Co. ("Mutual Trust").[1] Defendant contractors (more accurately subcontractors) in those transactions move for summary judgment, claiming the two owners are "indirect purchasers" within the meaning of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), and are thus barred from suing under the antitrust laws. For the reasons stated in this memorandum opinion and order, defendants' motion is denied.

### Facts[2]

There is no question that District 202 and Mutual Trust were not literally "direct purchasers" from the piping contractors, for in each of the four transactions there was a general contractor ultimately interposed between the owner and the piping contractor. That however is the beginning not the end of the inquiry, for the facts of each relationship must be examined to see whether a cost-plus or equivalent arrangement takes the transaction out of the *Illinois Brick* rule (as that case itself recognized, 431 U.S. at 732 n. 12, 97 S.Ct. at 2067 n. 12).

---

1. Even though just four purchases of piping materials and services are directly involved in the motion, defendants are seeking to play for larger stakes as well. If they could knock out District 202 and Mutual Trust as individual plaintiffs, they would challenge the standing of those plaintiffs as class representatives too.

2. As always on a summary judgment motion, the facts have been taken on the basis most favorable to the parties opposing the motion, with reasonable inferences also drawn in their favor.

## District 202 Transactions

First of the three District 202 construction projects was a building addition to Evanston Township High School in 1956. Before entering into the general contract District 202 obtained separate bids for general construction and the several mechanical trades (plumbing, heating, ventilating and electrical work). District 202's Board accepted the low bids and awarded contracts in each category. Indeed the piping contractor's bid to District 202 specifically stated:

> We agree to perform the Mechanical work on which this proposal is offered as sub-contract under the General Construction Contract at the price quoted above.

In turn the general contractor agreed to assume "overall direction and administrative supervision and coordination of work by the mechanical trades. . . ." As the general contract said, the mechanical trades bids:

> were accepted by the Owner [District 202] March 29, 1956. The Owner then authorized the execution of said work by subcontract under a General Construction Contract with Coath & Goss, Inc. under the provisions of Paragraph 48, Section I of the Specifications and the Proposals of the respective bidders.

As Exhibit 1 to this opinion (page 2 of the general contract) shows, the "contract sum" was specifically identified as the sum of the five individual proposals of the successful bidders, including that of a defendant here (Hanley & Company).

Second of the three District 202 projects was a 1962 third floor addition to the High School's technical building. District agreed to pay general contractor Erik A. Borg Company the actual "Cost of the Work" plus a $10,000 fixed fee for the general contractor's services. "Cost of the Work" was defined as (emphasis added):

> the actual job costs incurred in the performance of authorized work, including cost of wages of a Superintendent, all Foremen, Mechanics and Laborers at the job site, together with insurance, payroll taxes, etc., thereon; costs of materials, fabricated items, equipment and fixtures incorporated in the Work; the rental of any special equipment required to perform the Work; and *all subcontractors' work performed under this Contract.*

Then the general contractor obtained subcontractors' bids, submitted the lowest figures to District 202 for approval and let the subcontracts to the lowest approved bidders.

Finally, the 1966 alterations and additions to the High School involved an identical "cost of the work plus a fee" (in that instance the fixed fee was $300,000) to general contractor George Sollitt Construction Company. Again District 202 agreed to reimburse the general contractor for:

> all costs necessarily incurred for the proper execution of the work and paid directly by the Contractor, such costs to include the following items, and to be at rates not higher than the standard paid in the locality of the work except with prior consent of the Owner; . . .
>
> 6.10 The amounts of all sub-contracts included in the scope of the work.

And again the contract reflected District 202's approval and acceptance of the piping subcontractor and its specific bid as part of the "cost."

## Mutual Trust Transaction

Mutual Trust had its Oak Brook, Illinois headquarters building constructed in 1973. Its agreement with general contractor Turner Construction Co. ("Turner") included a fixed base fee of $109,410 together with the classic cost-plus language:

> The Owner shall pay to the Contractor, or directly, the cost of the Work, which shall include all costs reasonably or necessarily incurred in connection therewith (except those costs specified in the Agreement to be borne by the Contractor): such costs to include the following items: . . .
>
> (h) All subcontracts let in connection with the Work.

It had two variants frequently coupled with cost-plus contracts in the construction in-

dustry: a guaranteed maximum price[3] (in this case $3,126,110) and a provision for sharing any savings if "cost of the Work" ultimately proved less than that maximum. That sharing provision took the form of an added fee to Turner of 30% of the shortfall, so that Mutual Trust received 70% of any savings. In fact the actual "cost of the Work" came in below the $3,126,110 ceiling.

## Illinois Brick and Its Cost-Plus Exception

*Illinois Brick* announced the general rule that only direct purchasers from antitrust defendants could sue for treble damages under Clayton Act § 4. In the Supreme Court's view the alternative of permitting suits by indirect purchasers too—forcing a tracing and apportionment of the illegal overcharge along the chain of distribution—"would add whole new dimensions of complexity to treble damage suits and seriously undermine their effectiveness" (431 U.S. at 737, 97 S.Ct. at 2070).

But where that tracing-apportionment problem is not present—where the indirect purchaser's damages are plainly ascertainable without having to reconstruct the direct purchaser's probable competitive market response to the overcharge—the reason for the *Illinois Brick* rule vanishes. Accordingly the Supreme Court said a transaction such as a pre-existing cost-plus contract would give rise to an enforceable antitrust claim by the indirect purchaser (431 U.S. at 736, 97 S.Ct. at 2069):

> The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.

See also *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 494, 88 S.Ct. 2224, 2232, 20 L.Ed.2d 1231 (1968). Accord, *Jewish Hospital Ass'n v. Stewart Mechanical Enterprises, Inc.*, 628 F.2d 971, 976 (6th Cir. 1980):

> Because passing on the amount of the overcharge cannot decrease its sales, the direct purchaser has no incentive to absorb any of the overcharge itself. This being so, the problem of tracing the overcharge to the indirect purchaser is eliminated.

It only remains then to analyze the District 202 and Mutual Trust transactions in those terms. What is significant is not the tyranny of labels—direct vs. indirect purchaser, cost-plus vs. fixed-price contracts—but who has been directly damaged by the overcharge by the piping subcontractor.[4]

## District 202 Transactions

District 202 unquestionably bore every cent of illegal overcharge for each of the three projects. Its 1956 addition featured its acceptance of the subcontractors' bids and their subsequent incorporation into the District 202 Coath & Goss general contract. Had the Hanley & Company piping subcontract proposal been $140,744 rather than $165,744, by definition the total Coath & Goss contract price would have been $2,065,548 rather than $2,090,548. District 202 would have saved the entire $25,000. And the identical analysis (with different numbers, of course) extends to the 1962 and 1966 transactions.

Defendants seek to invoke *Jewish Hospital* to argue the general contractor in each District 202 project had an incentive to absorb the subcontractors' overcharges. On the contrary, *Jewish Hospital* points up the fallacy of their position. It involved precisely the opposite of District 202's cost-plus arrangements, for its general contractor *first* gathered bids from subcontractors and

---

**3.** Such a maximum is sometimes referred to as an "upset price" or "ceiling." Again in accordance with industry practice, the ceiling specified in Turner's bid to Mutual Trust was based on Turner's projection of its own anticipated costs plus what it expected it could reasonably anticipate in the way of bids from the bidding subcontractors. *After* it had been awarded the contract on the terms described in the text, it took bids from subcontractors and awarded the subcontracts, which then became part of the "cost of the Work."

**4.** In the analysis that follows in the text, it will be assumed there was an antitrust violation and a resulting overcharge in each project. Of course no ruling on that score is implied by this opinion.

*then* submitted its own overall bid to the owner.

Thus the general contractor in *Jewish Hospital* made the market decision as to how to peg its own total bid in light of the subcontractors' bids it had received. Those bids played no *direct* part in the amount the owner actually paid. As the Court of Appeals said, 628 F.2d at 977:

> Since the general contractor presumably did not know what its competitors would bid, it had an incentive to absorb part or all of the overcharge. That being so, we do not consider the relationship between Wilhelm [the general contractor] and the Hospital [the owner] the functional equivalent of a pre-existing contract.

*Jewish Hospital* thus turned on the bidding procedure employed by the owner, under which the general contractor had the normal competitive incentive to absorb part or all of the overcharge to submit the lowest bid and get the contract. No such incentive operated in the District 202 transactions, where each general contractor first obtained its contract and then added on the independently obtained subcontractors' bids on a dollar-for-dollar basis.

*Mutual Trust Transaction*

Except for the added element of the provision for sharing cost savings (frequently encountered in construction of major commercial buildings), analysis of the Mutual Trust transaction leads to the identical conclusion. Because the project's cost came in *under* the ceiling originally estimated by Turner, Turner received an "additional fee equal to 30% of such savings" (Contract Art. 6). That fact however does not vitiate the owner's right to sue.

It is plainly irrelevant that the contract labeled the savings-sharing arrangement a "fee" to Turner rather than a cost reduction to Mutual Trust. In economic terms a $20,000 piping contract overcharge attributable to the antitrust price-fixing conspiracy would have inured entirely to Mutual Trust's benefit in Turner's accounting for "cost of the Work," but Turner's "fee" would have increased by 30% of that $20,000, or $6,000. Thus Mutual Trust suffered $14,000 in economic loss—in damages—because of the anticompetitive conduct.

As was true of District 202's projects, there is complete ease of computation in damages here. None of the complicated tracing problems that motivate decisions like *Illinois Brick* and *Jewish Hospital* applies to Mutual Trust. All that is at work here is the fact (hardly unique) that a tortfeasor's misconduct has injured two parties (Mutual Trust *and* Turner) rather than one, each in a precisely ascertainable amount. Under such circumstances there is no reason that the tortfeasor should not be liable to each victim.[5]

---

**5.** It must be confessed that the text analysis oversimplifies the problem slightly, but not in a way that affects Mutual Trust's rights. Turner did agree to absorb all costs above the ceiling price, established by it based on its own estimates of probable costs (including expected subcontractor bids) *before* it sought subcontractor proposals. Because its market expectations proved sound (not at all unusual for an experienced major general contractor like Turner), the ceiling never came into play, and the injury sustained by Mutual Trust—70% of the overcharge caused by the price-fixing conspiracy—was exactly as stated in the text. Suppose however that Turner had been operating in a business climate of lower piping construction costs because there had been no such antitrust conspiracy. *Illinois Brick* teaches that it is uncertain, and courts will not undertake to learn, whether competitive forces would have led the contractor to pass on part or all of the savings to its customer (in this case in the form of setting a lower ceiling price as part of its bid) or simply to increase its own profits (in this case by bidding with the same ceiling price it actually set). One thing is morally certain: Had Turner known from its knowledge of the piping construction market (a free competitive market under this hypothesis) that such portion of its anticipated costs was *lower,* it would not have *raised* the ceiling figure it established with the knowledge it actually possessed. What we have then is the other side of the coin from *Illinois Brick:* If under the actual numbers the ceiling were close enough to the real ultimate costs that a reduction in the ceiling would have caused *more* than 70% of the eliminated overcharge to benefit the owner, Mutual Trust (the "indirect purchaser") would have sustained more than 70% of the antitrust damage and Turner (the "direct purchaser") would have sustained less. Under the *Illinois Brick* reasoning that possibility might bar *Turner* from a successful antitrust action, but it

## Conclusion

Defendants' summary judgment motion is fatally flawed in its approach. *Illinois Brick* does not apply to bar action by District 202 or Mutual Trust. Defendants' motion is denied.

cannot affect *Mutual Trust*'s ability to recover for the 70% figure that represents the *least*