839 F.2d 1206
 56 USLW 2409, 1987-2 Trade Cases 67,869
 STATE OF ILLINOIS, ex rel. Neil F. HARTIGAN, Attorney
General of the State of Illinois, in its proprietary
capacity, in its parens patriae capacity, and in its
representative capacity, Plaintiff-Appellee,
v.
PANHANDLE EASTERN PIPE LINE COMPANY, a Delaware corporation,
Defendant- Appellant.
 No. 85-2601.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 26, 1986.
Decided Jan. 22, 1988.
Order Granting Rehearing En Banc April 28, 1988.*
 
 Paul H. LaRue, Chadwell & Kayser, Ltd., Chicago, Ill., for defendant-appellant.
 Richard L. Miller, Burke & Smith, Chtd., Chicago, Ill., for plaintiff-appellee.
 Before BAUER, Chief Circuit Judge, POSNER, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.
 FAIRCHILD, Senior Circuit Judge.
 
 
 1
 This appeal involves a treble damage action on behalf of Illinois consumers of natural gas. These consumers buy from distributors, who buy from defendant Panhandle, an interstate pipeline company. It is alleged that Panhandle violated the antitrust laws and overcharged the distributors. Under public utility regulation, one component of the price the distributors charge the consumers is the cost of gas to the distributors. It is claimed that Panhandle's overcharge is thus passed on to the consumers; because they are only indirect purchasers from defendant, they can claim injury in a treble damage action only if their purchases are within an exception to the rule of Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).
 
 
 2
 Plaintiff argues, in substance, that the public utility regulation creates a sufficiently close approximation of a pre-existing cost-plus contract for a fixed quantity so as to fulfill that exception. 431 U.S. at 736, 97 S.Ct. at 2069. The district court agreed and denied Panhandle's motion to dismiss. Permission for this appeal was obtained pursuant to 28 U.S.C. Sec. 1292(b). We reverse.
 
 
 3
 Plaintiff is the state of Illinois. It is both a direct and indirect purchaser of natural gas from Panhandle, but the State's claims as to direct purchases are not before us. The state also sues as parens patriae on behalf of natural persons residing in Illinois[1] who are indirect purchasers from Panhandle, and also brings a class action on behalf of all indirect purchasers from Panhandle.
 
 
 4
 The complaint did not spell out a claim that these indirect purchasers fall within an exception to Illinois Brick. Plaintiff alleged only that it had been injured in its business and property. Facts illuminating the claim of an exception to Illinois Brick have, however, been brought before the district court. There has been no argument that the pleading was deficient, that the claim of exception was waived, or that the issue cannot be decided on the present record.
 
 
 5
 Central Illinois Light Company (CILCO) is one of the distributors of Panhandle gas (along with smaller quantities of gas of other producers). There are distributors other than CILCO, and their customers are among the consumers represented by the State in this action. The parties have concentrated their discussion, however, on the CILCO facts, and appear to accept them as representative.
 
 
 6
 CILCO's monthly bills to its customers contain three components: (1) an amount per customer not dependent on the amount of gas used; (2) an amount per therm of gas used, calculated to recover a share of fixed expenses and provide a profit margin; and (3) a gas charge factor. Through a process of estimate in advance and retrospective adjustment,[2] the gas charge factor approximates the actual cost of gas, but without perfect accuracy at any one time. As plaintiff looks at it, component (3) represents the "cost" and components (1) and (2) the "plus" in analogizing to the cost-plus exception in Illinois Brick. The arrangement has no element which corresponds to the agreed quantity element of that exception.
 
 
 7
 For the purpose of discussion, it is convenient to separate CILCO's customers into two groups:
 
 
 8
 (a) Sixteen Large Industrial Customers
 
 
 9
 These customers are able to switch to alternate fuel. In 1983, CILCO was threatened with the loss of these customers because of the high cost of gas. A loss of up to 20% of its sales was expected. CILCO responded by obtaining permission from the regulators to reduce its profit margin and thus its price for gas for a four-month period. Although in form there was no reduction in component (3), and component (3) included the unlawful overcharge if there was any, the reduction in the profit portion of component (2), and consequently in the total price, made it unreal to say that the full amount of any overcharge was passed on. Thus there was necessarily an injury to CILCO if some part of the cost resulted from an unlawful overcharge. Hence, it is especially clear as to these customers that there is no Illinois Brick exception. The relationship between CILCO and these industrial customers did not approach a cost-plus contract for a fixed quantity. Moreover, if the industrial customer were permitted to press a claim on a pass-on theory, it could not claim that it suffered the entire injury. Apportionment between the direct and indirect purchaser would be required, precisely the process rejected by the Illinois Brick Court. 431 U.S. at 746, 97 S.Ct. at 2074.
 
 
 10
 (b) Residential and Other Smaller Quantity Consumers
 
 
 11
 These consumers, like the large industrial customers, have no obligation to purchase any particular quantity of gas. Their demand is elastic to some degree, and a high price (including an unlawful overcharge, if any) will reduce CILCO's sales and profits. Consumers of this type can to some extent use alternative fuels, and they have resorted to conservation in response to an increased price.
 
 
 12
 CILCO sold 46,400,000 Mcf of gas in 1982, but its sales decreased by 14.7% in 1983 and 2.3% in 1984. It lost 1,061 customers in 1983 and 693 in 1984. Increased prices thus reduced CILCO's sales and profits as well as being passed on to customers to the extent of sales made. Assuming that the prices charged CILCO by Panhandle included an unlawful overcharge, it had adverse consequences on both CILCO and its customers. Again, if the customers' claims were to be recognized, there must be apportionment of recovery between the direct and indirect purchasers.
 
 
 13
 As the Illinois Brick Court observed, with respect to the pre-existing cost-plus contract,
 
 
 14
 [i]n such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance without reference to the interaction of supply and demand that complicates the determination in the general case.
 
 
 15
 431 U.S. at 736, 97 S.Ct. at 2069.
 
 
 16
 As is evident, plaintiff here cannot really claim that CILCO's relationship with its customers falls literally within the confines of a pre-existing cost-plus contract for a fixed quantity. Plaintiff does, however, assert that the relationship is the "functional equivalent" of a cost-plus contract for a fixed quantity, and relies on In re Beef Industry Antitrust Litigation, 600 F.2d 1148 (5th Cir.1979).
 
 
 17
 In Beef Industry, defendants were retail chains which allegedly conspired to fix at low levels the prices to be paid packers for beef. The packers allegedly computed the price they paid cattlemen by a formula based on the price the packers were to receive. The plaintiffs were cattlemen, claiming that the unlawful undercharge was passed on to them. The Fifth Circuit held that plaintiffs had alleged the functional equivalent of cost-plus contracts, and thus an exception to the Illinois Brick rule which would otherwise have prevented recovery by an indirect seller.[3]
 
 
 18
 In Beef Industry, the court noted that economic forces made the supply of fat cattle "inelastic in the short term." 600 F.2d at 1154. It is not clear, however, that the court relied on this inelasticity as the functional equivalent of the predetermination of volume inherent in a cost-plus contract for a fixed quantity. "Functional equivalence is not lost simply because the proponent of passing-on theory cannot demonstrate that the middleman suffered no loss in volume as the result of raising the price to his customers." 600 F.2d at 1164.
 
 
 19
 In our view, however, the Illinois Brick Court regarded the predetermination of quantity as an essential element of the exception. Thus there could be a "functional equivalent" of a cost-plus contract for a fixed quantity only where factors such as obligations imposed by law or economic forces or a combination of them made inevitable an exact passing on of price variation applied to a predetermined quantity to the same extent as a contract so providing.[4]
 
 
 20
 In Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481, 494, 88 S.Ct. 2224, 2232, 20 L.Ed.2d 1231 (1968), in suggesting that "a pre-existing 'cost-plus' contract" would be an exception to the Hanover rule against a pass-on defense, there was no express reference to the fixed quantity element of the cost-plus contract. In Illinois Brick, in describing the same exception, there was such a reference, and an explanation of its importance:
 
 
 21
 In such a situation, the [direct] purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price....
 
 
 22
 As we have noted, supra [431 U.S.] at 735-736 [97 S.Ct. at 2069-2070], Hanover Shoe itself implicitly discouraged the creation of exceptions to its rule barring pass-on defenses, and we adhere to the narrow scope of exemption indicated by our decision there.
 
 
 23
 431 U.S. at 736, 745, 97 S.Ct. at 2069, 2074.
 
 
 24
 It appears in the case before us that Panhandle's alleged antitrust violations would produce actual injury to both the direct and indirect purchasers. The indirect purchasers pay a higher price per therm of gas because Panhandle's price is reflected in the price they pay. CILCO, the direct purchaser, is injured by loss of sales and profit. Where this is so, we conclude that Illinois Brick does not permit the indirect purchasers to sue for their part of the injury. It may be that because of the utility regulation requiring that CILCO's cost per therm be passed through to its customers, the avoidance of multiple recovery against Panhandle will be less complex than in a case where the direct purchaser's price to the indirect purchaser will be the result of less channeled market forces. It may be easier to separate accurately the injury to the indirect purchasers from the injury to CILCO. Illinois Brick did not, however, leave it to the discretion of the lower courts to expand the exceptions to include situations within some range of approximation of the exceptions defined in Illinois Brick. We read Illinois Brick as requiring that in this, as well as more complex cases, it is only the direct purchaser who may bring a treble damage action.
 
 
 25
 The order appealed from is REVERSED, with directions to dismiss the complaint as to all claims by or on behalf of indirect purchasers.
 
 
 26
 POSNER, Circuit Judge, concurring and dissenting.
 
 
 27
 Central Illinois Light Company, a retail distributor of natural gas, bought natural gas from the defendant, an interstate gas pipeline company, at prices allegedly inflated because of violations of the antitrust laws by the defendant, and resold the gas to its customers. The question--and it is a difficult one--is whether any of those customers can sue the pipeline company on the theory that CILCO passed on the entire cost of the overcharge to them in the form of higher rates.
 
 
 28
 Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), held that it is not a defense to a damages action that a buyer forced to pay a higher price because of the seller's antitrust violation passed on the cost of the violation to his own customers by raising his prices to them--unless the buyer had a cost-plus contract with them. Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), announced a corollary to Hanover Shoe: the "indirect purchaser" (that is, the customer of the buyer, who is the "direct purchaser") cannot sue to recover the part of the overcharge that the buyer passed on to him. The Court again recognized an exception for the cost-plus contract, noting that it insulates the direct purchaser from "any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price." Id. at 736, 97 S.Ct. at 2069. Fastening on the words "fixed quantity," my brethren hold that the cost-plus exception is never available when the indirect purchasers are free to vary the quantity they buy from the direct purchaser.
 
 
 29
 This is not the first court to confine the exception so. See Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573, 577 n. 9, 580 (3d Cir.1979); In re Midwest Milk Monopolization Litigation, 730 F.2d 528, 533 (8th Cir.1984); Lefrak v. Arabian American Oil Co., 487 F.Supp. 808, 819 (E.D.N.Y.1980); cf. Arizona v. Shamrock Foods Co., 729 F.2d 1208, 1212 n. 2 (9th Cir.1984). But the previous cases involved privately negotiated cost-plus contracts rather than cost-plus contractual provisions required by public utility regulation, which may make a difference as we shall see. Nor is it clear from the Supreme Court's opinion in Illinois Brick whether the reference to fixed quantity was intended to state an independent requirement of the cost-plus exception or merely to describe a normal contract situation, where the buyer's obligation is to buy the quantity specified in the contract. Not all contracts have this feature, but there is no indication that the Court meant to distinguish between fixed-quantity and variable-quantity contracts. Not only is the reference to fixed quantity dictum, because the case did not involve a fixed-quantity contract; the Court's entire discussion of cost-plus contracts is dictum, because the case did not involve a cost-plus contract but merely an argument (which the Court rejected, see 431 U.S. at 744, 97 S.Ct. at 2073) that a buyer's practice of rule-of-thumb cost-plus pricing should be enough to allow his customers to sue.
 
 
 30
 Although several district courts have rejected an exception for cost-plus regulation, see Go-Tane Service Stations, Inc. v. Ashland Oil, Inc., 508 F.Supp. 200, 204 (N.D.Ill.1981); City of Cleveland v. Cleveland Electric, Illuminating Co., 538 F.Supp. 1320 (N.D.Ohio 1980); U.S. Oil Co. v. Koch Refining Co., 518 F.Supp. 957 (E.D.Wis.1981), the cases are factually distinguishable; and in the case whose facts are most like those of the present case the district court held that indirect purchasers could sue, because public utility regulation had created "a straight cost passthrough." In re New Mexico Natural Gas Antitrust Litigation, 1982-1 Trade Cases p 64,685, at p. 73,722 (D.N.Mex.1982). Cf. County of Oakland v. City of Detroit, 628 F.Supp. 610, 613 (E.D.Mich.1986); Illinois v. Borg, Inc., 548 F.Supp. 972, 975-76 (N.D.Ill.1982). (An additional wrinkle in that case, however, was that the direct purchasers were in cahoots with the defendants; this was an independent ground for allowing the indirect purchasers to sue.) It is possible to allow indirect purchasers to sue in a case such as the present one without embracing the ill-defined "functional equivalent" approach of In re Beef Industry Antitrust Litigation, 600 F.2d 1148 (5th Cir.1979); see also, e.g., Gulf Oil Corp. v. Dyke, 734 F.2d 797, 809 (T.E.C.A.1984), effectively criticized in In re Midwest Milk Monopolization Litigation, 529 F.Supp. 1326, 1337-38 (W.D.Mo.1982), aff'd, 730 F.2d 528 (8th Cir.1984); Comment, A Legal and Economic Analysis of the Cost-Plus Contract Exception in Hanover Shoe and Illinois Brick, 47 U.Chi.L.Rev. 743, 756-70 (1980); cf. Abbott Dairies Division v. Butz, 584 F.2d 12, 16-17 (3d Cir.1978), and found to be inapplicable to conditions in the beef industry itself in In re Beef Industry Antitrust Litigation, 710 F.2d 216, 219-20 (5th Cir.1983). However, for reasons to be explained, I would not allow all the indirect purchasers in this case to sue--just the residential consumers.
 
 
 31
 To determine whether (or to what extent) this case is within the rule of Illinois Brick, we must consider the reasons for confining the right to sue to the direct purchaser; for it is the reasons behind a rule that determine its scope. First, the direct purchaser is closer to the violation, hence more likely to discover it. We therefore want to make sure that he has a powerful incentive to bring the violator to book, and we do this by holding out to him the prospect of recovering the entire damages for the violation if he wins the suit. Second, it is difficult to apportion damages between direct and indirect purchasers by the methods of litigation. A direct purchaser who finds himself paying a higher price for inputs would love to pass on all of the additional cost to his customers in the form of a higher price, but he can't, because a price that much higher will so reduce the demand for his product that his profits will fall unacceptably. The optimal adjustment to the increased cost of the input will be a price increase smaller than the increase in input cost. But this means that the increased cost will be divided between the two tiers, the direct and indirect purchasers--but in what proportions will often be hard to determine. An additional complication is that the higher input price may induce the direct purchaser to use more of an alternative input, and this substitution will affect the proportion of the initial overcharge that the direct purchaser can recoup.
 
 
 32
 Where the direct purchaser has a cost-plus contract with his customers that requires them to buy a fixed quantity, the reasons for confining the right to seek damages to the direct purchaser cease to be fully persuasive. There is no longer a problem of apportionment, because the whole of any price increase will have been passed on to the customers. Yet the other reason for confining the right to seek damages to the direct purchaser survives: he has better information about the violation. And, despite the cost-plus nature of the contract, he has everything to gain from suing. He will not have to share any of the damages that he recovers with his customers unless the contract contains a clause (or a court is persuaded to adopt an imaginative conception of unjust enrichment) that entitles them to any rebate which he might receive, probably years later, on an input used in performing his side of the bargain.
 
 
 33
 In the present case, where cost-plus pricing is the product of public utility regulation rather than a purely private contract, the reasons balance out slightly differently, but the case for applying the cost-plus exception of Illinois Brick is no weaker once the balance is restruck. The public utility has less to gain from suit than the direct purchaser in the purely private contract case has because the public utility commission may force the utility to pass on to the consumers any and all damages that the utility recovers. If so, the utility will have no incentive to sue; and it is no surprise that CILCO did not sue (and apparently the statute of limitations has now run). And although the amount of gas purchased by the utility's customers is not fixed in their contract with the utility, there is no problem of apportionment with respect to the only class of customers that I would allow to sue, the residential customers.
 
 
 34
 To see this, notice first that the retail distribution of natural gas through a grid of pipes to the customers' homes or places of business is a classic natural monopoly, Omega Satellite Products Co. v. City of Indianapolis, 694 F.2d 119, 123, 126 (7th Cir.1982); so, in the absence of regulation, a gas utility would charge a monopoly price. Although the efficacy of public utility regulation has been questioned (see, e.g., Stigler & Friedland, What Can Regulators Regulate? The Case of Electricity, 5 J.Law & Econ. 1 (1962); Moore, The Effectiveness of Regulation of Electric Utility Rates, 36 So.Econ.J. 365 (1970)), the facts of this case suggest, and the parties seem to agree, that residential natural-gas rates in Illinois are lower because of regulation than they would be in an unregulated market, implying that CILCO has unused monopoly power in that market. The situation in the industrial market is different. Some industrial consumers of natural gas have good alternatives, and as to them CILCO apparently had no unused monopoly power that would enable it to shift the whole of the cost increase to them. Instead CILCO sought and obtained regulatory permission to reduce its profit margin on sales to these customers, thereby offsetting in part the higher rates enabled by the automatic pass-through provision.
 
 
 35
 The residential consumers have no good alternatives to natural gas, and as to them CILCO's profit-maximizing course of action was, it appears, to allow its rates to rise by the exact amount of the increase in its gas costs. Rate regulation evidently had succeeded in keeping CILCO's rates to a level where the demand for its gas was inelastic. In this region of a firm's demand curve, an increase in price will by definition increase the firm's revenues, because the price increase will not be offset by an equal or greater proportional decline in quantity demanded--that is what it means to say that demand is inelastic. And since the increase in price will reduce the firm's costs (by causing demand for its product to fall, since consumers will buy less at the higher price) at the same time that it causes the firm's revenues to rise, the firm's profits must increase. CILCO had therefore (with a qualification to be considered shortly) every incentive to raise its price by the full amount allowed by the regulatory commission--that is, by the full amount of the gas overcharge. This implies that the entire overcharge was passed on to the utility's residential consumers on all sales made to these consumers.
 
 
 36
 Put more simply, if because of regulation a utility's rates are below what it would like to charge, it will raise those rates by the full amount allowed by the regulatory commission unless such an increase would carry the utility above its optimal level. It is unclear from the record filed in this court how large the allowance was; conceivably the commission allowed CILCO to double its rates--yet even so, if regulation had forced CILCO to charge half or less of its preferred price, CILCO would pass through the entire cost increase. No one suggests that CILCO in fact absorbed any of the increase, so far as sales to its residential customers were concerned.
 
 
 37
 The mechanics of the pass-through provision are important. The "Uniform Purchase of Gas Adjustment Clause" that the Illinois commission required CILCO to include in its contracts not only entitled but directed CILCO, if it paid Panhandle Eastern Pipe Line Company an extra penny per million cubic feet of gas, to add exactly one penny to each customer's bill for every Mcf of gas sold to that customer. So if all of its customers had continued buying the same amount of gas, CILCO would have suffered no loss on account of the overcharge. To the extent that the utility lost residential sales because it was charging a higher price--and no doubt it lost some sales, because demand is never perfectly inelastic--the loss was a loss to the utility, was not passed on to its customers (at least in any sufficiently direct way to escape the rule of Illinois Brick ), and hence is not an allowable factor in computing the customers' damages.
 
 
 38
 To illustrate the distinction between the two types of loss, suppose that the price to CILCO's residential customers before the overcharge to CILCO by Panhandle Eastern Pipe Line Company was $1 per Mcf, the overcharge was 10cents per Mcf, and therefore by operation of the Uniform Purchase of Gas Adjustment Clause the retail price rose to $1.10 because CILCO made no offsetting reduction in another component of the price, as it did with its industrial customers. Suppose further that at the new, higher price CILCO sold only 950,000 Mcf, whereas at the old price it had sold one million Mcf; and suppose that nothing plausibly accounts for the decrease in sales except the price increase, which induced consumers to use less gas. Cf. Illinois Power Co. v. Commissioner, 792 F.2d 683, 687-88 (7th Cir.1986). The loss to each consumer would be the number of Mcf he bought at the new price times 10cents; the loss to CILCO would be its lost profits on the sales it did not make.
 
 
 39
 Clearly, then, there is no problem of apportionment in the suit by the residential customers. Those customers are not seeking damages for gas they didn't buy, and the damages for the gas they did buy can simply be read off from their gas bills. (Well, almost: at the beginning of each year the utility estimates the amount of rate increase necessary to cover any increase in its gas bill, and there is an adjustment at the end of the year based on actual experience.) The only problem would come if CILCO had tried to sue for its lost sales, for then there would be more than one set of plaintiffs. But each set would be suing in respect of different sales--not, as in a Hanover Shoe or Illinois Brick case, the same sales. There would be no haggling over how much of the overcharge on each sale had been borne ultimately by the direct purchaser and how much by the indirect purchaser. And the proof of CILCO's lost sales would be straightforward--at least as straightforward as is possible in an antitrust case. It would involve comparing the utility's sales before and after the increase in gas prices, correcting for other factors, besides the increase, that might have affected those sales. Such correction is not always easy but is a conventional aspect of calculating damages in antitrust cases; it has to be done in every case where the plaintiff claims to have lost sales because of the defendant's unlawful conduct and the defendant argues that the loss was due partly or entirely to other factors. More important, it is a computational problem that has nothing to do with the problem that concerned the Supreme Court in Hanover and Illinois Brick. To repeat, the Court was concerned with the situation where two purchasers of the same thing--the initial purchaser and the purchaser from the initial purchaser--are or could be complaining that both had been hurt, and the problem is to apportion the loss between them. Here only the residential consumers could complain about a loss from the overcharge on the gas they bought, while only CILCO could complain about a loss caused by the overcharge on gas that the residential consumers did not buy.
 
 
 40
 Finally, unless the indirect purchasers are allowed to sue, the antitrust violation is likely to go unremedied, because the direct purchaser has even less incentive to sue than in a contractual cost-plus setting. CILCO might have an incentive to sue in respect of its lost sales (a distinct item of damages, as we have seen), but this would depend on how many sales it lost and on whether it would have to pass through any damages to its customers. In fact the incentive was not enough to induce it to sue.
 
 
 41
 I am not suggesting that the rule of Illinois Brick has no application to cases where the direct purchaser is subject to rate regulation. Although cost-plus is the spirit of rate regulation, the flesh is weak and often therefore the utility has considerable flexibility in pricing, much like an unregulated firm. Indeed, to the extent that the utility operates free from effective rate regulation--either because it faces competition that depresses its rates below the regulated level (apparently CILCO's situation with its industrial customers), or because the regulators are unable to prevent it from charging monopoly prices to its captive customers--its situation is identical to that of an unregulated seller. But in the case of CILCO's residential customers, regulation apparently succeeded in forcing the utility to operate deep in the inelastic region of its demand curve, with the result that 100 percent passing on of any cost increase was the optimal strategy for the utility to follow.
 
 
 42
 With the rapid and unanticipated increases in fuel prices during the 1970s, utilities pressed for and obtained the right to include automatic fuel pass-through provisions in their contracts with customers, provisions that would allow the utility to pass on every dollar in higher prices that it paid for gas or other fuels to its customers without going through the time-consuming process of obtaining regulatory authorization to raise rates. Such provisions are also found in unregulated contracts and should be treated the same there when the contract requires the buyer to take either a fixed quantity or his requirements, since a buyer cannot reduce his purchases under a requirements contract merely because he is dissatisfied with the terms of the contract as they have worked themselves out. See Wilsonville Concrete Products v. Todd Building Co., 281 Or. 345, 352, 574 P.2d 1112, 1115 (1978); Royal Paper Box Co. v. E.R. Apt Shoe Co., 290 Mass. 207, 195 N.E. 96 (1935); Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp., 130 F.2d 471, 473-74 (3d Cir.1942); White & Summers, Handbook of the Law Under the Uniform Commercial Code 126 (2d ed. 1980). (This example shows, by the way, why a rigid requirement of fixed quantity would be a senseless limitation on the cost-plus exception of Hanover Shoe and Illinois Brick: a buyer under a requirements contract does not have discretion as to the amount to take under the contract.) If on the other hand the buyer has complete flexibility as to how much to buy, a cost-plus provision is ineffectual; the buyer can always condition an agreement to buy a specific amount on the seller's agreeing to modify the contract by reducing the price. This is another reason for supposing that an agreement to take a fixed quantity, or, what is equivalent for these purposes, an agreement to take one's requirements, is implicit in the cost-plus exception rather than being an independent requirement for invoking it. The unexhausted monopoly power of a regulated utility takes the place of a fixed-quantity or requirements provision. The utility can force the whole of the cost increase through to its residential customers without sacrificing any profits, and did so.
 
 
 43
 I would not allow the industrial customers to sue, however. By cutting its profit margin to them, CILCO raised its price by less than the increase in gas cost; and while the apportionment of that increase between the utility and its industrial customers is easy to make--precisely because the utility was required to get approval for reducing its profit margin--I would be reluctant to complicate the administration of the Illinois Brick rule by trying to distinguish between difficult and easy apportionment cases. And the Court seemed unwilling to listen to such arguments. However, for every cubic foot of gas bought by a residential customer, we know that the whole overcharge was passed on to the customers, in accordance with the fuel pass-through provision.
 
 
 44
 It might seem an unimportant detail whether a buyer reacts to an overcharge by raising its price by less than the overcharge (as CILCO did with its industrial customers), thus losing fewer customers, or by raising its price by the full overcharge and thereby losing more customers than it would if it swallowed part of the overcharge. But in the second case the problem of apportioning losses on the same sales does not arise. It might also seem impermissible under Illinois Brick to inquire into the amount of passing on but the Court made an explicit exception for cases where there is a cost-plus contract. There is such a contract here--the automatic fuel pass-through provision--and although it is not a contract for a fixed quantity or (what I contend is equivalent for purposes of the exception) the buyer's requirements, the existence of public utility regulation is an adequate substitute in the circumstances.
 
 
 45
 We can never be absolutely certain that regulation has resulted in a 100 percent pass through; for all we know, CILCO would have sought a rate increase but for the gas overcharge, and by forbearing to do so in effect absorbed part of the overcharge. But by the same token, the seller under a fixed-quantity cost-plus contract might forbear to insist on a 100 percent pass through in order to curry favor with the buyer for the sake of future deals. No counterfactuals are certain, but the doubts here are too small to warrant us in insisting that this potentially serious antitrust violation, which may have imposed on consumers of natural gas aggregate damages of almost $50 million, go unremedied, as apparently it will.
 
 
 46
 The suit by the residential customers is within the scope of the cost-plus exception to the rule of Illinois Brick, and I would therefore affirm the denial by the district court of the defendant's motion to dismiss the complaint insofar as the complaint seeks damages on behalf of CILCO's residential customers.
 
 ORDER
 
 47
 On consideration of the petition for rehearing and suggestion for rehearing en banc filed by counsel for plaintiff-appellee in the above-entitled cause, a vote of the active members of the Court was requested. A majority of the judges in regular active service above named** voted to GRANT the petition and suggestion for rehearing en banc. Accordingly.
 
 
 48
 IT IS ORDERED that the aforesaid petition for rehearing and suggestion for rehearing en banc be, and the same are hereby, GRANTED.
 
 
 49
 IT IS FURTHER ORDERED that the judgment and opinion entered in this case on January 22, 1988 be, and are hereby, VACATED. This case will be reheard en banc on Thursday, May 26, 1988 at 930 AM.
 
 
 
 *
 Opinion and judgment vacated
 
 
 [1]
 15 U.S.C. Sec. 15c
 
 
 [2]
 Under the Purchase Gas Adjustment (PGA) process, CILCO estimates the purchases, costs and sales in a future period, computes the cost for that period and adjusts its rates prospectively to reflect the estimate. At the end of each year, the estimated and actual costs are reconciled. In 1983, CILCO overcollected more than $3 million, and in 1984 more than $1 million. Overcollections are refunded through adjustments in the following year. A customer who terminates service before the refund does not receive it. A customer who used less gas in the refund period than he used in the overcollection period does not receive a full refund
 
 
 [3]
 On remand, it developed that plaintiff could not, in fact, demonstrate the habitual use by the packers of a predetermined formula, as alleged, preventing the packers from absorption of some of the undercharge. Judgment was granted to defendants. 542 F.Supp. 1122 (N.D.Tex.1982), affirmed 710 F.2d 216 (5th Cir.1983)
 
 
 [4]
 Plaintiff has cited a case involving the regulated distribution of natural gas and a PGA mechanism similar to the one before us. New Mexico Natural Gas, CCH 1982-1 Trade Cases p 64,685, p. 73,714 (D.N.M.1982) . Treble damage actions were brought by and on behalf of consumers who purchased from a defendant distributor, who purchased from defendant producers. Producer defendants sought summary judgment based on Illinois Brick. The New Mexico court denied the motion, finding an exception because two policy considerations underlying Illinois Brick were not significant in the case before it. One of the policy considerations was the difficulty in tracing the pass-on of an overcharge. The New Mexico court decided that the PGA clauses obviated this concern. The second policy consideration was the risk of multiple liability if indirect as well as direct purchasers could sue. The New Mexico court found this concern was not significant in the case before it. The court relied on the fact, which it acknowledged was unusual, that the distributor was a defendant and alleged to be a partner with defendant producers in the price-fixing conspiracy, and would be precluded from suing its co-conspirators. The New Mexico court did not address the question whether the demand for gas is elastic and the distributor (direct purchaser) may have been injured by loss of sales volume. The New Mexico Gas case is distinguishable